## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

RICHARD F. VETTER, *et al*,

         Plaintiffs,

    v.

RUST-OLEUM CORPORATION,

         Defendant.

No. 1:21-cv-17397

**OPINION**

---

**APPEARANCES**:

Matthew Connolly
Kenneth T. Levine
DeLuca Levine LLC
301 East Germantown Pike
3rd Floor
East Norriton, PA 19401

    *On behalf of Plaintiffs.*

Andrew P. Fishkin
Zachary W. Silverman
Fiskin Lucks LLP
One Gateway Center
Suite 1150
Newark, NJ 07102

    *On behalf of Defendant.*

**O'HEARN, District Judge.**

This matter comes before the Court on a motion for summary judgment and a motion to preclude the expert testimony of Plaintiffs', Richard F. Vetter and Bryan Miner[1] (collectively, "Plaintiffs"), expert witness by Defendant, Rust-Oleum Corporation ("Defendant"). (ECF Nos. 48, 50). Plaintiffs thereafter cross-moved for partial summary judgment on Defendant's affirmative defenses. (ECF No. 52). The Court did not hear oral argument pursuant to Local Rule 78.1. For the reasons that follow, Defendant's Motion for Summary Judgment is **DENIED in part** and **GRANTED in part**, Defendant's Motion to Preclude Plaintiffs' Expert is **DENIED in part and GRANTED in part**, and Plaintiffs' Cross-Motion for Summary Judgment is **DENIED.**

## **BACKGROUND**[2]

### **A.  The March 2021 Fire**

This matter arises out of a March 9, 2021, fire at Plaintiffs' vacant home. (Def. SOMF, Def. Br., ECF No. 50-2, ¶ 1). While renovating their home, Plaintiffs bought Defendant's Varathane Classic Wood Stain ("Varathane") to stain their wood floors. (Def. SOMF, Def. Br., ECF No. 50-2, ¶ 2). After applying Varathane to their floors, Plaintiffs left the applicators saturated in the product in their home. (Pl. SOMF, Pl. Br., ECF No. 52-3, ¶ 4; Def. Resp. to Pl. SOMF, Def.

---

[1]  State Farm Fire and Casualty ("State Farm") has a property insurance subrogation lien on Plaintiffs' claim. Indeed, State Farm filed a Ratification Affidavit in this case authorizing the action to be prosecuted on its behalf and agreed to be bound by the results of the action. (ECF No. 13; Def. Br., Silverman Cert., Def. Br., ECF No. 51-24, Ex. X). The Affidavit states that State Farm is "subrogated to the real and personal property losses and additional living expenses (a/k/a loss of use) asserted in this action by operation of payments made (or to be made) pursuant to an insurance contract in place between the named plaintiffs and State Farm." *Id.* Additionally, in the Affidavit, State Farm "agree[d] to be bound by all rulings and judgments in this action . . . as if it were a named Plaintiff" and waives "any right to pursue its subrogation interests outside of this litigation." *Id.*

[2]  The facts set forth herein are undisputed unless otherwise noted.

Br., ECF No. 57-1, ¶ 4). Subsequently, a fire occurred at the home. (Def. SOMF, Def. Br., ECF No. 50-2, ¶ 1).

Plaintiffs allege the fire was caused by the spontaneous combustion of the applicators soaked with Varathane. (Def. SOMF, Def. Br., ECF No. 50-2, ¶ 2). And for purposes of the pending motions only, (Def. Resp. to Pl. SOMF, Def. Br., ECF No. 57-1, ¶ 6), Defendant does not dispute Plaintiffs' allegation that the rags spontaneously caught fire. After the fire, the Burlington County Fire Marshal determined that "the probable ignition sequence consisted of spontaneous combustion of stain-soaked rags and rollers igniting the available combustible material in the area leading to a self-sustaining fire." (Levine Cert., Pl. Br., ECF No. 64-6 at 10, Ex. B).

All wood stains, including Varathane, contain drying oils, semi-drying oils, and drying agents to properly cure the product. (Def. SOMF, Def. Br., ECF No. 50-2, ¶ 4). As these oils and agents cure—or dry—they undergo a chemical process called oxidation, where they release heat. (Def. SOMF, Def. Br., ECF No. 50-2, ¶ 6). Indeed, drying agents accelerate oxidation. (Def. SOMF, Def. Br., ECF No. 50-2, ¶ 6).  If the heat generated in this process cannot escape, there is a potential for spontaneous combustion. (Def. SOMF, Def. Br., ECF No. 50-2, ¶ 6).

The Varathane label includes a spontaneous combustion warning and instructions on how to prevent this from occurring. (Def. SOMF, Def. Br., ECF No. 50-2, ¶ 10). On the front of the product, the label states "WARNING! COMBUSTIBLE LIQUID AND VAPOR. VAPOR HARMFUL. HARMFUL OR FATAL IF SWALLOWED. Read carefully other caution on back panel." (Varathane Label, Silverman Cert., Def. Br., ECF No. 51-8, Ex. H). The back panel contains the following warning outlined in red bordering:

> DANGER: Rags, steel wool or other waste with this product may spontaneously catch fire if improperly discarded. Immediately after use, place rags, steel wool or waste in a sealed, water-filled, metal container. DISPOSAL: Dispose of

contaminated absorbent, container and unused contents in accordance with local,
state, and federal regulations.

(Varathane Label, Silverman Cert., Def. Br., ECF No. 51-8, Ex. H).

Because of the fire, Plaintiffs asserted claims for strict liability (Count One), negligence

(Count Two), and breach of implied warranty (Count Three), against Defendant. (Compl., ECF

No. 1, ¶¶ 12–42; Def. SOMF, Def. Br., ECF No. 50-2, ¶ 2). All the claims are grounded on the

theories of failure to warn and design defect. Specifically, Plaintiffs maintain that the Varathane

label lacked an adequate warning with respect to spontaneous combustion and that Varathane

should have been designed to eliminate any purported spontaneous combustion risk. (Compl., ECF

No. 1, ¶¶ 12–42; Def. SOMF, Def. Br., ECF No. 50-2, ¶ 2).

**B.  The Report and Deposition of Plaintiffs' Expert, Jennifer Morningstar**

Plaintiffs retained an engineering expert, Jennifer Morningstar, who authored reports

evaluating the role of Varathane in the March 2021 fire at Plaintiffs' home.  (Mornington Rep.,

Def. Br., Silverman Cert., ECF No. 49-6, 9, Exs. F, I). On January 10, 2023, Morningstar was

deposed. (Morningstar Dep., Def. Br., Silverman Cert., ECF No. 49-13, Ex. M).

Morningstar, a professional engineer licensed in 2017 and Certified Fire and Explosion

Investigator, is a senior consulting engineer with the Warren Group, Inc. (Morningstar Rep., Def.

Br., Silverman Cert., ECF No. 49-6, Ex. F at 4, Morningstar Dep., Def. Br., Silverman Cert., ECF

No. 49-13, Ex. M at 50:12–14). Morningstar has an undergraduate degree in chemical engineering

from Virginia Tech. (Morningstar Dep., Def. Br., Silverman Cert., ECF No. 49-13, Ex. M at 34:1–

6; Mornington Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 19). Morningstar is a

member of the American Institute of Chemical Engineers and the National Association of Fire

Investigators. (Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 22). As an

expert witness, Morningstar has been deposed several times in litigation matters. (Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 28–30).

At the Warren Group, Morningstar performs "specialized consulting related to property loss and unintentional injuries resulting from industrial accidents, fire, and explosions." (Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 19). She also has experience, as a chemical engineer, working on the production of chemical products involving polymer and polymerization, though not specifically involving wood stains. (Morningstar Dep., Pl. Br., ECF No. 63-4 at 77:8–19). And she has general experience with drying oils and additives. (Morningstar Dep., Pl. Br., ECF No. 63-4 at 77:8–19).

In her report, Morningstar explained the process of spontaneous combustion and the role drying oils and agents play in that process. (Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 5). She also discussed the drying oils contained in Defendant's wood stain product. (Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 6). Ms. Morningstar opined that:

> The hazard of spontaneous combustion exists with oil-based wood stains due to the curing reaction of the drying oils. The first, and most effective, way to deal with this hazard is to eliminate it from the product. Fortunately, wood stains do not need to be manufactured with drying oils or drying agents. There are numerous wood stains on the market, including those sold by the defendant, that use water as the carrying medium for the pigment instead of oil. They are referred to as either waterborne, water-based, or acrylic. As this category of stains contains neither the drying oils nor drying agents, they do not have the hazard of spontaneous combustion associated with their use.

(Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 9).

In reaching her opinion, she relied on a report from the National Fire Protection Association and multiple studies discussing waterborne coating wood stains, among other documents.

(Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 7–11). Ultimately, Morningstar opined in her report:

> Rust-Oleum's Varathane Classic Penetrating Wood Stain was designed in a defective manner because a reasonably safer design existed in the form of a waterborne substitute product that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the product. The obvious safety benefit from altering the design would be greater than any claimed disadvantages caused by the proposed alternative design, including any diminished usefulness.

(Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 12). And in her rebuttal report, she echoed this opinion, explaining that the presence of water in waterborne wood stains "is what removes the spontaneous combustion hazard from waterborne substances." (Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-9, Ex. I at 6).

## I.      PROCEDURAL HISTORY

On September 23, 2021, Plaintiffs commenced this action, naming Rust-Oleum Corporation as Defendant. (ECF No. 1). On May 24, 2023, Defendant filed the present motions. (ECF Nos. 48, 50). That same day, Plaintiffs cross-moved for partial summary judgment. (ECF No. 52). Plaintiffs filed opposition to Defendant's motions on July 7, 2023.  (ECF Nos. 62, 64). Defendant opposed Plaintiffs' cross-motion and filed a reply in support of its motion on August 14, 2023. (ECF Nos. 65–66). Plaintiffs filed a reply in support of their cross-motion on August 14, 2023. (ECF No. 67).

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court shall grant summary judgment when "a movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion

for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may

not make credibility determinations or engage in any weighing of the evidence; instead, the non-

moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in [her]

favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477

U.S. at 255). A court's role in deciding a motion for summary judgment is not to evaluate the

evidence and decide the truth of the matter but rather "to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its

motion and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986). Once met, the burden shifts to the nonmoving party to "go beyond the

pleadings and by [her] own affidavits, or by the depositions, answers to interrogatories, and

admissions on file, designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at

324 (quoting FED. R. CIV. P. 56(a)). To withstand a properly supported motion for summary

judgment, the non-moving party must identify specific facts and affirmative evidence that

contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely

'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v.

Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477

U.S. at 249–50). Ultimately, there is "no genuine issue as to any material fact" if a party "fails to

make a showing sufficient to establish the existence of an element essential to that party's case."

*Celotex Corp.*, 477 U.S. at 322.

## III.   <u>DISCUSSION</u>

### A. Motion to Preclude Plaintiffs' Expert's Testimony[3]

Defendant has moved to preclude Morningstar, on grounds that she is not qualified to render opinions on oil-based or water-based wood stains and that her testimony is not based on reliable methodologies, or any discernable methodology. (Def. Br., ECF No. 48-1 at 5). The Court disagrees.

The admissibility of expert witness testimony is governed by Federal Rule of Evidence 702, and the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny. *Daubert* and Rule 702 require courts to determine the admissibility of expert testimony in light of three factors: (1) the qualifications of the expert; (2) the reliability of the expert's methodology and the application of that methodology; and (3) whether the testimony fits the matters at issue in the case. *In re Paoli R.R. Yard PCB Litig.* (*In Re Paoli I*), 35 F.3d 717, 741–43 (3d Cir. 1994). The Third Circuit has noted that "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence," and there is a "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact and for dealing with the risk of error through the adversary process." *In re Paoli R.R. Yard PCB Litig.* (*In Re Paoli II*), 916 F.2d 829, 856 (3d Cir. 1990) (internal quotations and citations omitted). Yet, the Court has an "obligation to insure that only reliable and relevant expert testimony be presented to jurors." *Tyger v. Precision Drilling Corp.*, 832 F. App'x 108, 111–12 (3d Cir. 2020). And recently, Rule 702 was amended to clarify that expert testimony may not be admitted unless the proponent demonstrates that it is more likely than not that the proffered

---

[3]   To the extent that any exhibits attached to Defendant's Motion to Preclude were not exchanged during discovery or identified as documents relied on by the experts, those exhibits are not properly before the Court and thus, will not be considered. *See* (Pl. Br., ECF No. 62 at 11).

testimony meets the admissibility requirements under the Rule. *See* F.R.E. 702.

As Defendant contests the first two factors only, the Court so limits its analysis. Turning first to Morningstar's qualifications, Defendants argue Morningstar is not qualified to opine on oil-based wood stains. (Def. Br., ECF No. 62 at 13–16).  In turn, Plaintiffs argue Morningstar, a chemical engineer, is well-qualified to opine on the spontaneous combustion phenomenon, the composition of Defendant's product and its chemical propensity to support such a hazard, a review of spontaneous combustion events arising from such products, and the availability of an alternative safer design for wood finishes. (Pl. Br., ECF No. 62 at 14). The Court agrees with Plaintiffs.

Regarding the qualifications prong, an expert's qualifications should be assessed "liberally," recognizing that "a broad range of knowledge, skills, and training qualify an expert as such" and, as such, the Third Circuit has "been satisfied with generalized qualifications." *In re Paoli I*, 35 F.3d at 741. In fact, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have specialization that the court considers most appropriate." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)). While Defendant argues Morningstar is not qualified because she has no post-graduate degree and has not specifically worked with wood stains, the Court does not view the requisite experience to properly qualify as an expert in this case so narrowly.

As noted, Morningstar has a chemical engineering degree, is a licensed professional engineer, and a certified fire and explosion investigator. (Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 4; Morningstar Dep., Def. Br., Silverman Cert., ECF No. 49-13, Ex. M at 50:12–14). She has served as an expert witness in other lawsuits.  (Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 28–30). Specifically, in two cases, she was an expert

regarding the role wood stains played in house fires. (Def. Br., Silverman Cert., ECF No. 49-13, Ex. M at 11:4–13, 15:15–17:19). Given her background and experience, she is certainly qualified to opine as to the process of spontaneous combustion, the role drying agents play in that process, the presence of drying agents in wood stains, and that there is an alternative product already available in the market. None of these topics are beyond the scope of her background and qualifications as a chemical engineer and fire and explosion investigator. *See, e.g., Hammond v. International Harvester Co.*, 691 F.2d 646, 653 (3d Cir. 1982) (concluding automobile and agricultural equipment salesperson who taught high school automobile classes qualified as an expert in a personal injury case involving a tractor).

Indeed, the "strengths and weaknesses of an expert's qualifications are instead frequently factored into the *weight* given to that expert's testimony, rather than its admissibility." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996); *Christoforetti v. Bally's Park Place, Inc.*, No. 12-4687, 2021 WL 3879074, at *6 (D.N.J. Aug. 31, 2021) ("Any argument [that the expert's] education, experience, or training does not provide a viable industry standard goes to the weight of [the expert's] testimony, not its admissibility."). And unlike the cases Defendant relies on, here, Morningstar opines that there is an alternative *already* on the market. In the cases cited by Defendant, there were deficiencies with the experts' opinions as to the practicality of the recommended safety features and their familiarity with the relevant safety standards. *See* (Def. Br., ECF No. 48-1 at 15–16). Here, there are no such issues since, in Morningstar's opinion, the water-based wood stain, already available on the market, is an alternative product to the oil-based wood stain. *See* (Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 8–11).

Turning to the reliability of Morningstar's opinion, "[w]hen an expert testifies to scientific knowledge, the expert's opinions must be based on the methods and procedures of science rather

than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." *Walker v. United States*, No. 04-1524, 2006 WL 8458685, at *4 (E.D. Pa. Apr. 17, 2006) (quoting *In re Paoli I*, 35 F.3d at 743) (internal quotation marks omitted). In determining whether an expert's opinions are reliable, courts consider the following factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli I*, 35 F.3d at 742 n.8. Courts have "considerable discretion" in making these reliability determinations. *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 329 (3d Cir. 2002). In defective design cases, the following factors are often evaluated by the Court when determining reliability:

> (1) federal design and performance standards, (2) standards established by independent standards organizations, (3) relevant literature, (4) evidence of industry practice, (5) product design and accident history, (6) illustrative charts and diagrams, (7) data from scientific testing, (8) the feasibility of any suggested modification, and (9) the risk-utility of any suggested modification.

*Ebenhoech v. Koppers Indus. Inc.*, 239 F. Supp. 2d 455, 467 (D.N.J. 2002).

As Plaintiffs argue, some of these considerations have less utility as it is Morningstar's opinion that a product *already available* on the market is comparable to and safer than Varathane. She is not suggesting new modifications. As such, considerations as to the feasibility of suggested modifications and the risk-utility of those suggested modifications are not particularly useful in this case.

Defendant appears to misstate Morningstar's overall opinion in that she opines that Varathane's risks can be reduced given the existence of a safer design. And though she does not

specifically reference the Consumer Product Safety Commission ("CPSC") or the fact that the CPSC has not yet required cautionary labels for the risk of spontaneous combustion, this is not fatal to the reliability of her opinion. Morningstar is not opining that the risk of spontaneous combustion must be identified on the label of Varathane. Instead, it is Morningstar's opinion that the risk of spontaneous combustion is reduced in water-based wood stains, a product that is already available on the market. In opining that the risk presented by oil-based wood stains can be eliminated, she relies on the Safety Hierarchy, a standard Morningstar claims is universally known. (Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 8–9). And Morningstar, as Plaintiffs note, also relies on literature discussing water-based wood stains in addition to fire incident reports and data to opine as to the frequency of fires involving oil-based wood stains. (Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 8–11). She also discusses the differences in the product design and substances in oil- and water-based wood stains. (Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 8–11).

Finally, the fact that she did not conduct any testing herself does not, in and of itself, call into question the reliability of her opinion. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d. 14, 76–77 (D.D.C. 2017) (rejecting arguments that expert failed to perform certain analysis, stating "[t]he Court does not consider these challenges to be *Daubert* arguments because they do not call into question the reliability of the work [the expert] actually performed."). Overall, here, Plaintiffs have met their burden to show that it is more likely than not that the proffered testimony meets the admissibility requirements under the Rule. *See* F.R.E. 702. Additionally, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The Court is confident that Defendant's counsel can ably

cross-examine Morningstar as to the relevant issues and a jury can determine what weight, if any, should be afforded as to her opinion. However, to the extent that Morningstar opines, or seeks to opine, that the product is defectively designed, the Court agrees that this is an impermissible legal conclusion and that she cannot so testify at the time of trial. *See Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2011 WL 1673805, at *8 (E.D. Pa. May 4, 2011) ("First, to the extent [the expert] plans to testify that [defendant] behaved negligently in the conduct of its business, such testimony constitutes an improper legal opinion."); *Berckeley Inv. Grp., Ltd. v. Colkitt,* 455 F.3d 195, 217 (3d Cir. 2006) (citation and internal quotation marks omitted) ("Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that embraces an ultimate issue to be decided by the trier of fact, an expert witness is prohibited from rendering a legal opinion.").

For these reasons, Defendant's Motion to Preclude Morningstar's Testimony is granted in part and denied in part.

### B. Summary Judgment

Defendant has moved for summary judgment, arguing on the failure-to-warn claim, that (1) State Farm is collaterally estopped from contesting that its warnings claim is preempted by the Federal Hazardous Substances Act ("FHSA"), (2) Plaintiffs' claim is preempted by the FHSA, and (3) the Varathane label provides sufficient warning under the FHSA. (Def. Br., ECF No. 50-1 at 20–29). As to the design defect claim, Defendant maintains that Plaintiffs do not have the necessary expert testimony to prevail and even if Morningstar's testimony is admitted, her opinion does not satisfy Plaintiffs' burden to establish a design defect. (Def. Br., ECF No. 50-1 at 29–35). Plaintiffs cross-moved for summary judgment on their failure-to-warn claim, arguing that the FHSA does not preempt their claims. (Pl. Br., ECF No. 52-1 at 8–23). The Court concludes that summary judgment is appropriate as to Plaintiffs' failure-to-warn claim but denies summary

judgment as to Plaintiffs' defective design claim.

Plaintiffs' claims arise under the New Jersey Products Liability Act, N.J.S.A. § 2A:58C-2, which provides in relevant part:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

Though Plaintiffs bring separate claims for negligence and breach of implied warranty, in addition to strict liability, "the NJPLA generally subsumes common law product liability claims, thus establishing itself as the sole basis of relief under New Jersey law available to consumers injured by a defective product." *Hindermyer v. B. Braun Med. Inc.*, 419 F. Supp. 3d 809, 817 (D.N.J. 2019) (quoting *Repola v. Morbark Indus., Inc.*, 934 F.2d 483, 492 (3d Cir. 1991)); *see also Elezovic v. Motor Coach Indus., Inc.*, No. 22-110, 2022 WL 3316018, at *2 (D.N.J. Aug. 11, 2022) ("Thus, through the enactment of the [NJ]PLA, common law claims of negligence, strict liability, or breach of an implied warranty that pertain to injury from a product are no longer viable as separate claims."). Additionally, neither party addresses any claim other than the NJPLA in this case. Therefore, Plaintiffs' claims will be analyzed solely under the NJPLA.

1. Plaintiffs' Failure-to-Warn Claim

a. Collateral Estoppel

Defendant asserts that State Farm—which it argues is the real party in interest—having twice previously litigated this issue unsuccessfully, is now collaterally estopped from doing so a third time in this case. (Def. Br., ECF No. 50-1 at 21–22). In response, Plaintiffs argue that there is a lack of identical parties in all three cases, as these individual Plaintiffs have never brought a lawsuit against Defendant. (Pl. Br., ECF No. 64-2 at 9). Additionally, Plaintiffs maintain because

there are no prior substantive legal decisions on this issue, collateral estoppel cannot apply. (Pl. Br., ECF No. 64-2 at 9).

The doctrine of collateral estoppel prevents a party from relitigating issues that have already been decided in prior lawsuits. *Peterson v. Holmes*, No. 11-2594, 2017 WL 1653949, at *4 (D.N.J. May 2, 2017) (citing *In re Docteroff*, 133 F.3d 210, 214 (3d Cir. 1997)). "Collateral estoppel exists to promote judicial consistency, encourage reliance on court decisions, and protect defendants from being forced to relitigate the same issues in multiple lawsuits." *Id.* (citing *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). In New Jersey, a party seeking to invoke the doctrine must show that: "(1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding." *Id.* (citation omitted).

Defendant relies on two prior cases for its collateral estoppel argument: *McGrath v. Rust-Oleum Corp.*, No. 12-1719, 2013 WL 2896966 (E.D. Pa. June 12, 2013), and *State Farm General Ins. Co. v. Sherwin-Williams Co.* (*Pomerleau*), No. 21-0220, 2021 WL 4913558 (C.D. Ca. July 26, 2021). In *McGrath*, a case in which State Farm also had a property insurance subrogation lien, individual plaintiffs brought a tort action against Defendant after rags soaked in its Watco Teak Oil Finish spontaneously combusted and started a fire in their home. 2013 WL 2896966, at *1. On summary judgment, the *McGrath* court agreed with the plaintiffs and determined that the Watco Teak Oil Finish was a "misbranded hazard substance"—a hazardous substance that fails to bear a label that complies with FHSA requirements—under the FHSA because its warning label did not comply with the FHSA's standards. *Id.* Specifically, the court found that the warning label failed

15

to reference linseed oil as a hazardous component. *Id.* at \*6. The court, however, rejected the plaintiffs' argument that the label was misbranded because it did not list spontaneous combustion as a principal hazard. *Id.* at \*7–8. In so concluding, the court noted that "[a]lthough the FHSA does not define 'principal hazard,' it is plain that the statute does not consider spontaneous combustion to be a *principal* hazard as it does not even consider a substance to be a 'hazardous substance' when its only hazard is that of spontaneous combustion." *Id.* at \*8. Additionally, the court explained that "the FHSA and accompanying regulations never even reference spontaneous combustion, and we are aware of no court that has recognized spontaneous combustion as a separate 'principal hazard' under the statute." *Id.*

Thereafter in *McGrath*, in a motion in limine, the plaintiffs sought a ruling that the FHSA does not preempt tort claims alleging inadequate warnings as to the risk of spontaneous combustion. (Silverman Cert., Def. Br., ECF No. 51-26, Ex. Z at 6). The court denied the motion, which it deemed as seeking reconsideration of the prior summary judgment decision, reiterating that the court had "already held that spontaneous combustion is within the purview of the [FHSA], insofar as we've ruled that the [FHSA] and regulations require linseed oil, which presents the risk of spontaneous combustion, be referenced on the product label." (Silverman Cert., Def. Br., ECF No. 51-28, Ex. BB at 6:6–11; 9:17–21).

In *Pomerleau*, the plaintiff, State Farm General Insurance Company, sued as a subrogating property and casualty insurer to recover property insurance proceeds paid to the homeowners. 2021 WL 4913558, at \*1. There, the plaintiff argued that the defendants Sherwin-Williams and Rust-Oleum Corporation violated the FHSA by failing to include information concerning the principal hazard of spontaneous combustion conspicuously and prominently on their labels. *Id.* at \*3. Ultimately, the court concluded that the FHSA does not require disclosure of spontaneous

combustion as a principal hazard. *Id.*

Of the five elements to establish collateral estoppel, Defendant's argument primarily fails on the final factor: whether there are identical parties, or parties in privity, in both lawsuits. Undoubtedly, these individual Plaintiffs were not parties in either *McGrath* or *Pomerleau*. In *Pomerleau*, State Farm General Insurance Company sued as a subrogating property and casualty insurer to recover proceeds it have made to the individual homeowners. 2021 WL 4913558, *1. And in *McGrath*, individual homeowners brought the lawsuit, in which, like here, State Farm had a property insurance subrogation lien. 2013 WL 2896966, *1. Thus, there is no dispute that the parties are not identical and as such, collateral estoppel can only apply if the parties were in privity.

In determining whether there is privity between parties, "the New Jersey Supreme Court has suggested that the determinative question . . . is whether one party was the 'virtual representative' of the other, in the sense that the former could control the arguments of the latter." *Elfar v. Twp. of Holmdel*, No. 22-5367, 2023 WL 4366293, at *5 (D.N.J. July 6, 2023) (citing *Evans v. City of Newark*, No. 14-120, 2023 WL 2535283, at *12 (D.N.J. Mar. 16, 2023)). "A relationship is usually considered close enough only when the party is a virtual representative of the non-party, or when the non-party actually controls the litigation." *Id.* (quoting *Zirger v. Gen. Acc. Ins. Co.*, 676 A.2d 1065, 1071 (N.J. 1996)). There is also a fairness component in applying collateral estoppel as it is an equitable doctrine. *See Allen v. V & A Bros.*, 26 A.3d 430, 444 (N.J. 2011). As such, "[u]ltimately, the question of privity is whether the party has 'had his day in court on an issue.'" *Elfar*, 2023 WL 4366293, at *5 (quoting *McAndrew v. Mularchuk*, 183 A.2d 74 (N.J. 1962)).

Though Defendant maintains that State Farm is ultimately controlling the litigation, State Farm's Ratification Affidavit only states that it authorized Plaintiffs to bring this lawsuit and that

it agreed to be bound by the outcome. (ECF No. 13; Def. Br., ECF No. 51-13). Indeed, in the Affidavit, State Farm "agree[d] to be bound by all rulings and judgments in this action . . . as if it were a named Plaintiff" and waived "any right to pursue its subrogation interests outside of this litigation." *Id.* This alone does not suggest that State Farm is controlling the lawsuit and Defendant submits no factual information to support its allegation that in fact it is doing so. Unlike the case on which Defendant relies, it is unclear here whether State Farm, as the insurance carrier, "is merely using the name of the insured as a nominal plaintiff in seeking a recovery for its own benefit." *Rossum v. Jones*, 235 A.2d 206, 209 (N.J. App. Div. 1967). More importantly, these individual Plaintiffs have not had their day in court. As such, though *Pomerleau* and *McGrath* are relevant and instructive for the issues presented in this case, these individual Plaintiffs should not be collaterally estopped from arguing that their state law claims are not preempted by the FHSA.

      b.  <u>Preemption</u>

Defendant maintains that Plaintiffs' failure-to-warn claim is both expressly and impliedly preempted by the FHSA. (Def. Br., ECF No. 50-1 at 16). In their cross-motion, Plaintiffs seek summary judgment on any affirmative defense alleging that their claim is preempted or limited by the FHSA. (Pl. Br., ECF No. 52-1 at 1). The Court agrees with Defendant, as have many other federal courts, and finds that Plaintiffs' claim is preempted by the FHSA.

The FHSA was enacted "to provide nationally uniform requirements for adequate cautionary labeling of packages of hazardous substances which are sold in interstate commerce and are intended or suitable for household use." H.R. REP. NO. 86-1861, at 1 (1960). For this reason, "[t]he central requirement of the Act is that manufacturers of hazardous products provide cautionary labels clearly indicating the hazards and providing consumers with directions for use." *Pomerleau*, 2021 WL 4913558, at *2 (quoting *Chem. Specialties Mfrs. Ass'n, Inc. v. Allenby*, 958

F.2d 941, 945 (9th Cir. 1992)). As such, the FHSA regulates the labeling of "hazardous substances," defined as any substance or mixture of substances which is:

> (i) is toxic, (ii) is corrosive, (iii) is an irritant, (iv) is a strong sensitizer, (v) is flammable or combustible, or (vi) generates pressure through decomposition, heat, or other means, if such substance or mixture of substances may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonably foreseeable handling or use, including reasonably foreseeable ingestion by children.

15 U.S.C. § 1261 (f)(1)(A). Most relevant to this case, "[c]ombustible" is defined by the regulations as "any substance having a flashpoint at or above 100°F (37.8 °C) to and including 150 °F (65.6 °C). . . ." 16 C.F.R. § 1500.3.

A manufacturer violates the labeling requirements under the FHSA when it introduces into interstate commerce any "misbranded hazardous substance." 15 U.S.C. § 1263. A "misbranded hazardous substance" is any hazardous substance that does not have a label, which states conspicuously:

> (C) the signal word "DANGER" on substances which are extremely flammable, corrosive, or highly toxic; (D) the signal word "WARNING" or "CAUTION" on all other hazardous substances; (E) an affirmative statement of the principal hazard or hazards, such as "Flammable", "Combustible", "Vapor Harmful", "Causes Burns", "Absorbed Through Skin", or similar wording descriptive of the hazard; (F) precautionary measures describing the action to be followed or avoided, except when modified by regulation of the Commission. . . . ; (G) instruction, when necessary or appropriate, for first-aid treatment; (H) the word "poison" for any hazardous substance which is defined as "highly toxic" by subsection (h); (I) instructions for handling and storage of packages which require special care in handling or storage; and (J) the statement (i) "Keep out of the reach of children" or its practical equivalent, or, (ii) if the article is intended for use by children and is not a banned hazardous substance, adequate directions for the protection of children from the hazard, and

15 U.S.C.A. § 1261 (p)(1). The FHSA requires that these statements "are located prominently and are in the English language in conspicuous and legible type in contrast by typography, layout, or color with other printed matter on the label." 15 U.S.C. § 1261(p)(2).

The FHSA is administered by the CPSC. 15 U.S.C. § 2079. The FHSA provides for reasonable variations from these requirements, stating "[i]f the [CPSC] finds that the requirements of section 1261(p)(1) of this title are not adequate for the protection of the public health and safety in view of the special hazard presented by any particular hazardous substance, it may by regulation establish such reasonable variations or additional label requirements as it finds necessary for the protection of the public health and safety. . . ." 15 U.S.C.A. § 1262(b). "Labels that do not comply with the regulations that the CPSC has promulgated may be deemed misbranded as well." *Pomerleau*, 2021 WL 4913558, at *3 (citing *McGrath*, 2013 WL 2896966, at *3).

The FHSA further preempts States from establishing additional labeling requirements for hazardous substances:

> if a hazardous substance or its packaging is subject to a cautionary labeling requirement under section 2(p) or 3(b) designed to protect against a risk of illness or injury associated with the substance, no State or political subdivision of a State may establish or continue in effect a cautionary labeling requirement applicable to such substance or packaging and designed to protect against the same risk of illness or injury unless such cautionary labeling requirement is identical to the labeling requirement under section 2(p) or 3(b).

15 U.S.C. § 1261, note (b)(1)(A). Thus, the FHSA preempts state law failure-to-warn claims that exceed the requirements of the Act.

Here, in their opposition to Defendant's motion for summary judgment and in their cross-motion, Plaintiffs maintain that the FHSA does not govern labeling requirements for the risk of spontaneous combustion or for the disposal of such substances, and thus, their claims based on the failure to warn are not preempted. (Pl. Br., ECF No. 52-1 at 2). In other words, Plaintiffs argue that the preemption provision does not cover all precautionary labeling. Plaintiffs cite the language of the preemption provision—"same risks of illness or injury"—that they maintain limits the scope of preemption and does not preclude their claim. (Pl. Br., ECF No. 52-1 at 5). Plaintiffs contend that when this limiting language is read in tandem with the FHSA's definition of "hazardous

substances," it is apparent that the FHSA preempts claims addressing a risk of injury or illness stemming from the "handling or use" of a product that contains one of the six enumerated hazards in the definition of hazardous substances. (Pl. Br., ECF No. 52-1 at 6). Yet, Plaintiffs do not cite a single case that supports their position that the FHSA does not preempt a state law failure to warn claim based on the failure to warn or instruct as to the proper disposal and/or risk of spontaneous combustion. Conversely, Defendants cite a plethora of cases in which courts analyzed Plaintiffs' failure-to-warn claim under the FHSA.

As an initial matter, Varathane is a hazardous substance under the FHSA. *See* 15 U.S.C. § 1261(f). And, courts, including in the Third Circuit, "have uniformly held that the FHSA 'preempts all warning-based claims seeking to impose . . . labelling requirements [on hazardous substances] different than those stated in the FHSA." *Cambridge Mutual Fire Ins. Co. v. Rust-Oleum Corp.*, No. 22-12211, 2023 WL 7617984, at *2 (D. Mass. Nov. 14, 2023) (citing *Rees v. W.M. Barr & Co.*, 736 F. App'x 116, 124 (6th Cir. 2018)) (collecting cases). "That is, preemption obtains only where a state action regulates the same 'hazardous substance' and the same 'risk of illness or injury associated with [that] hazardous substance' which a FHSA regulation regulates." *Toy Mfrs. of Am., Inc. v. Blumenthal*, 986 F.2d 615, 618 (2d Cir. 1992). As explained, "[t]he conclusion that FHSA preempts failure-to-warn claims seeking to impose additional labelling requirements follows logically from the structure of the statute the object of which is to provide nationally uniform requirements for adequate cautionary labeling of packages of hazardous substances." *Cambridge Mutual Fire Ins. Co.*, 2023 WL 7617984, at *2 (citing *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 109 (2d Cir. 2001)). Thus, "[a] plaintiff cannot . . . bring a failure-to-warn claim based on a state-law theory that the product's label should have included particular warnings not required by the FHSA." *Mwesigwa v. DAP, Inc.*, 637 F.3d 884, 887 (8th Cir. 2011) (citing *Mattis v. Carlon*

*Elec. Prods.,* 295 F.3d 856, 861 (8th Cir. 2002)). Though Plaintiffs claim otherwise, this is precisely what they seek to do here—to bring a failure-to-warn claim based on a state-law theory that Varathane's label should have included warnings as to spontaneous combustion and disposal that are not required by the FHSA.

Put simply, Plaintiffs' argument that the FHSA does not preempt their claim as to inadequate warnings as the claim is related only to the risk of spontaneous combustion from improper disposal, (Pla. Br., ECF No. 52-1 at 10), fails. The FHSA preempts State or local labeling requirements for hazardous substances that are "designed to protect against the same risk of illness or injury" as the FHSA's labelling requirements. Here, the FHSA's regulation of the hazards of flammability and combustibility, *see* 15 U.S.C. § 1261(f)(1)(A)(v), certainly protect against the risk of a fire, which is the precise injury at issue in this case. That Congress has not identified spontaneous combustion as a principal hazard does not remove this potential hazard from the purview of the FHSA. Indeed, courts have routinely concluded that spontaneous combustion is not a principal hazard under the FHSA and thus have dismissed failure-to-warn claims on this basis on summary judgment. *See Pomerleau*, 2021 WL 4913558, at *3 (citation omitted) ("[N]o court appears to recognize spontaneous combustion as a principal hazard under the FHSA"); *see also Mains v. Sherwin-Williams Co.*, 640 F. Supp. 3d 373, 382 n.12 (E.D. Pa 2022) (collecting cases). For example, the California District Court, in analyzing a failure-to-warn claim involving a Varathane wood stain, explained that the signal words "danger" and "combustible" on the cautionary label were sufficient to comply with the FHSA. *Pomerleau*, 2021 WL 4913558, at *4. "Because spontaneous combustion is not a principal hazard under the FHSA, no reasonable jury could find that [the defendants] violated the FHSA by failing to identify a risk of spontaneous combustion on the principal display panel of . . . [the] containers." *Id*; *see also Mains*, 640 F. Supp.

3d at 388 ("[T]he FHSA do not require a label to display warnings of spontaneous combustion because it is not a principal hazard as defined by the statute."); *McGrath*, 2013 WL 2896966, at *8 ("Although the FHSA does not define 'principal hazard,' it is plain that the statute does not consider spontaneous combustion to be a *principal* hazard as it does not even consider a substance to be a 'hazardous substance' when its only hazard is that of spontaneous combustion."). And as recently as last month, the Massachusetts District Court explained:

> While both the statute and related regulations mandate warnings about combustibility and flammability, the specific risk of spontaneous combustion is not described in the statute. The examples provided in both demonstrate that the required specificity of warnings for 'principal hazard[s] is very generalized. Semantically, the risk of "spontaneous combustion" is implied within the risk that a product can combust generally. Nothing in the statute or implementing regulations suggests that warnings must refer to spontaneous combustion or to any other more specific permutation of the risk of combustibility.

> Accordingly, this Court agrees with [the] defendant, and all other federal district courts to have considered the matter, that spontaneous combustion is not a "principal hazard" subject to mandatory warnings under FHSA.

*Cambridge Mutual Fire Ins. Co.*, 2023 WL 7617984, at *3 (alteration in original).

The cases upon which Plaintiffs rely are inapplicable. Indeed, one case did not even involve cautionary labeling requirements, *see Chemical Specialties Mfrs. Assoc., Inc*, 958 F.2d at 950, and the other did not involve a hazardous substance, *see Toys Mfrs. of Am., Inc.*, 986 F.2d at 622. Plaintiffs' reliance on other materials, like the CPSC meeting logs, are similarly unpersuasive. As Defendant notes, the meeting logs actually reflect that the CPSC contemplated establishing labeling requirements for spontaneous combustion as it is empowered to do, *see* 15 U.S.C. § 1261(b), further evidencing that the CPSC has the authority under the FHSA to create labeling requirements for spontaneous combustion. *See* (Levine Cert., Pl. Br., ECF No. 52-8, Ex. F).

In short, the law could not be clearer that a plaintiff cannot bring a failure-to-warn claim based on state-law theories that the label should have included additional warnings not required

under the FHSA. The same is true of Plaintiffs' claim that the label failed to identify the proper disposal of the product. That the FHSA does not require disposal instructions does not mean that this issue falls outside the purview of the FHSA. Again, here, the labelling requirement Plaintiffs seeks to impose—disposal instructions regarding the risk of spontaneous combustion—would protect against, again, the same risk of injury, i.e., a fire. Courts have rejected similar arguments. *Mains*, 640 F. Supp. 3d at 383 n.12. Further evidence in support of this conclusion, as Defendant notes, is that the CPSC has enacted regulations providing for disposal instructions on other products. *See* 15 C.F.R. § 1500.83(a)(36)(ii).

Thus, Plaintiffs' failure-to-warn claim survives only if it fails to comply with the FHSA. But it does not because Plaintiffs fail to raise a material issue of fact in this regard. As other courts have found, no reasonable jury could find that the label violates the FHSA by failing to identify the risk of spontaneous combustion on the front label. *See Mains*, 2022 WL 16857007, at *9; *McGrath*, 2013 WL 2896966, at *8; *Pomerleau*, 2021 WL 4913558, at *8. While the FHSA does not require that the label warn about spontaneous combustion and proper disposal, the label nevertheless *does* include instructions for disposal to avoid the risk of spontaneous combustion. *See* (Silverman Cert., Def. Br., ECF No. 51-8, Ex. H).

For these reasons, the Court concludes that spontaneous combustion is not a "principal hazard" subject to mandatory warnings under the FHSA and Defendant's motion for summary judgment as to Plaintiffs' failure-to-warn claim, is granted.

2.  Plaintiffs' Design Defect Claim[4]

As for Plaintiffs' design defect claim, Defendant maintains that Plaintiffs do not have the necessary expert testimony, nor does it satisfy the prima facie burden to establish a design defect. (Def. Br., ECF No. 50-1 at 24). Plaintiffs contend that they have properly supported their claims with multiple expert witnesses. (Pl. Br., ECF No. 64-2 at 14). Here, there are factual issues that preclude summary judgment.

The standard for defective design liability is "that the product 'was not reasonably fit, suitable or safe for its intended purpose.'" *Mendez v. Shah*, 28 F. Supp. 3d 282, 297–98 (D.N.J. 2014) (quoting *Cornett v. Johnson & Johnson*, 998 A.2d 543, 562 (N.J. App. Div. 2010)). Plaintiffs must be able to prove that "(1) the product was defective; (2) the defect existed when the product left the hands of the defendant; (3) the defect proximately caused injuries to the plaintiff; and (4) the injured plaintiff was a reasonably foreseeable user." *Hindermyer*, 419 F. Supp. 3d at 823. To establish a prima facie case of design defect, a "plaintiff must assert that the product could have been designed more safely and present under a risk-utility analysis the existence of an alternative design that is both practical and feasible." *Mendez*, 28 F. Supp. 3d at 297–98 (citing *Lewis v. Am. Cyanamid Co.,* 715 A.2d 967, 980 (N.J. 1998)). As such, a plaintiff "may pursue a design defect claim by contending that its risk outweighs its harm, or that an alternate design exists." *Id.* (citation omitted). While there are many factors to consider in the risk-utility analysis, "the prevalent view is that unless one or more of the other factors might be relevant in a particular case, the issue upon which most claims will turn is the proof by plaintiff of a reasonable alternative design, the omission

---

[4]  In Defendant's moving brief, Defendant notes that while Plaintiffs appeared to allege a manufacturing defect claim in their Complaint, they have not pursued the claim in discovery nor provided expert testimony supporting that claim. (Def. Br., ECF No. 50-1 at 7 n.1). Since Plaintiffs do not respond nor brief manufacturing defect, the Court presumes Plaintiffs are not pursuing a manufacturing defect claim.

of which renders the product not reasonably safe." *Gremo v. Bayer Corp.*, 469 F. Supp. 3d 240, 255 (D.N.J. 2020) (citing *Cavanaugh v. Skil Corp.*, 751 A.2d 518, 522 (N.J. 2000)). Indeed, "[i]n New Jersey, an injured plaintiff does not have 'to prove a specific [design] defect.'" *Benitez v. JMC Recycling Sys. Ltd.*, No. 13-2737, 2017 WL 2815056, at *6 (D.N.J. June 29, 2017) (*Myrlak v. Port Auth. of N.Y. & N.J.*, 723 A.2d 45, 52 (N.J. 1999)). Instead, a showing that there is something wrong with the product is sufficient. *Id.* (citing *Myrlak*, 723 A.2d at 52).

Additionally, "[e]xpert testimony is required in a design defect case where the subject matter 'falls outside of the common knowledge of the factfinder and depends on scientific, technical, or other specialized knowledge.'" *Est. of Knoster v. Ford Motor Co.*, No. 01-3168, 2008 WL 5416399, at *4 (D.N.J. Dec. 22, 2008) (quoting *Jerista v. Murray,* 883 A.2d 350, 364 (N.J. 2005)). However, an additional test to establish defective design, the consumer expectations test, does not require expert testimony. Indeed, "[a] court may at times apply the consumer expectations test to determine whether a product was defectively designed." *Vicente v. Johnson & Johnson*, No. 20-1584, 2020 WL 7586907, at *9 (D.N.J. Dec. 21, 2020). This test is applicable when "it is self-evident that the product is not reasonably suitable and safe and fails to perform, contrary to the user's reasonable expectation that it would safely do the jobs for which it was built." *Id.* (internal quotation marks and citation omitted). For this test, the risk-utility analysis is unnecessary and "[t]he only material question is whether the product has been designed so as to pose a hazard that is contrary to the user's reasonable expectations." *Id.* (citation omitted). In undertaking the risk-utility analysis, the Court is cognizant that "[e]xcept in the rare case when the risk-utility analysis points to the appropriate result as a matter of law, the jury, not the court, ultimately resolves factual issues arising from a risk-utility analysis." *Gremo*, 469 F. Supp. 3d at 255–56 (*Lewis*, 715 A.2d at 979).

First, Plaintiffs' argument that the consumer expectation test applies lacks merit. (Pl. Br., ECF No. 64 at 17–18. This test is plainly inapplicable since no jury could find that Varathane is self-evidently defective. As discussed, expert testimony is needed in this case to explain the reason why Varathane poses a risk of spontaneous combustion. To apply the consumer expectation test, there must be "no relevant considerations which make the hazard inherent in the product or reasonably necessary to its functioning." *Vicente*, 2020 WL 7586907, at *9. Even Morningstar agrees that the drying oils in wood stains enable the wood stain to cure quicker. (Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 4–6). As such, Plaintiffs need expert testimony at trial to prevail on their defective design claim and the consumer expectations test does not apply.

Nevertheless, Plaintiff makes a prima facie case of design defect and there are factual issues, which preclude summary judgment. Specifically, Plaintiffs point to evidence that there is an alternative design already on the market that is practical and feasible and would prevent incidents of spontaneous combustion. Defendant, in turn, disputes that the alternative design—the water-based wood stain—is an exact replacement for the oil-based wood stain in its utility. Nevertheless, it is for jury to decide, with the aid of expert testimony, whether the product is defective given the factual disputes. "Generally, the factfinder is required to perform a risk-utility analysis in order to determine whether a product is defective in its design, and in performing a risk-utility analysis, an expert opinion is ordinarily relied upon to establish a reasonable alternative design." *Gremo*, 469 F. Supp. 3d at 255 (citing *Rocco v. New Jersey Transit Rail Operations, Inc.*, 749 A.2d 868, 879 (N.J. App. Div. 2000)).

A jury could certainly find, based on the record, that the product was used, and disposed of, in an objectively foreseeable manner since Plaintiffs applied Varathane to their floors and thereafter left the applicators used in the home. (Def. SOMF, Def. Br., ECF No. 50-2, ¶ 2; Pl.

SOMF, Pl. Br., ECF No. 52-3, ¶¶ 2, 4).  The jury could also find that the risk of harm posed using Varathane could have been avoided by the alternative product already on the market, which is practical and feasible with the aid of expert testimony. As discussed, Morningstar opined that water-based wood stains have the same utility as oil-based wood stains but do not pose the same risk of spontaneous combustion. (Morningstar Rep., Def. Br., Silverman Cert., ECF No. 49-6, Ex. F at 9).

For these reasons, the Court denies Defendant's Motion for Summary Judgment as to Plaintiffs' defective design claim.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED in part and DENIED in part** and the Motion to Preclude Plaintiffs' expert is **GRANTED in part** and **DENIED in part** and Plaintiffs' Cross-Motion for Summary Judgment is **DENIED**. An appropriate Order accompanies this Opinion.

**CHRISTINE P. O'HEARN**
**United States District Judge**